MILLENNIUM PETROCHEMICALS,
INC., Plaintiff,

v.

C.G. JAGO, et.al., Defendants.

No. 3: 98CV–433–J.

United States District Court,
W.D. Kentucky,
Louisville Division.

April 13, 1999.

Merrill S. Schell, Richard W. Iler, Wyatt, Tarrant & Combs, Louisville, KY, Joseph P. Dailey, Loren F. Selznick, Whitman, Breed, Abbott & Morgan, L.L.P., New York City, for Millennium Petrochemicals, Inc., plaintiff.

Douglas C. Ballantine, John T. Ballantine, Ogden, Newell & Welch, Louisville, KY, Leslie S. Ahari, Ross, Dixon & Bell, L.L.P., Washington, D.C., for C.G. Jago, Ancon Ins. Co., (U.K.) Ltd., defendants.

Douglas C. Ballantine, John T. Ballantine, Ogden, Newell & Welch, Louisville, KY, David M. Gische, Leslie S. Ahari, Ross, Dixon & Bell, L.L.P., Washington, DC, for H.R. Dumas, Assicurazioni Generali S.P.A., CNA Reinsurance of London, Limited, Compagnie D'Assurances Maritimes Aeriennes et Terrestres S.A., Folksam International Insurance Company, Guardian Royal Exchange Assurance PLC, Insco Limited, Ludgate Ins. Co., Stronghold, Ins. Co., Terra Nova Ins. Co., Turegum Ins. Co., Uasuda Fire & Marine Inc. Co. (U.K.) Ltd., defendants.

David M. Gische, Leslie S. Ahari, Ross, Dixon & Bell, L.L.P., Washington, DC, for Equitas Limited, Equitas Reinsurance Ltd., defendants.

Richard L. Walter, Boehl, Stopher & Graves, Paducah, KY, Louis G. Corsi, Stephen Jacobs, Landman, Corsi, Ballaine & Ford PC, New York City, David M. Gische, Leslie S. Ahari, Ross, Dixon & Bell, L.L.P., for North River Insurance Company, defendant.

**1.** As used herein, the name "Equitas" refers to Defendant Equitas Limited and Defendant Equitas Reinsurance Limited collectively.

**2.** A "Name" is basically an investor who buys and sells insurance risks. In order to secure their obligations to each policyholder, such as Plaintiff, the Names pledge their own personal assets. A group of Names then form a

## MEMORANDUM OPINION

JOHNSTONE, Senior District Judge.

This matter is before the Court on Defendants Equitas' Motion to Dismiss.[1] Plaintiff filed a response to which Defendant Equitas replied. After reviewing the file and being otherwise sufficiently advised, the Court finds that Defendant Equitas should be dismissed from this action. Defendant's Motion to Dismiss [dkt. # 4] is granted for the reasons set forth below.

### I. *Introduction*

Plaintiff brought this action for breach of an insurance policy, breach of the covenant of good faith and fair dealing, and for bad faith settlement practices in violation of the Kentucky Unfair Claims Settlement Practices Act. In addition to seeking a declaratory judgment, Plaintiff seeks interest on alleged amounts of reimbursement, punitive damages and attorney fees.

Defendant Equitas seeks a dismissal of the complaint against it on the grounds that the court lacks in personam jurisdiction and on the grounds that the complaint fails to state a claim upon which relief can be granted. In order to properly place the grounds upon which the motion is based into context, it becomes necessary to first briefly review the insurance background in this action.

### II. *Background*

In 1984, Plaintiff purchased several reimbursement insurance policies totaling the sum of $50 million to indemnify its directors from the expense of any litigation they might incur while acting on behalf of the company. These insurance policies were sold by members of the Lloyds of London Society who are referred to as "Names."[2] To memorialize the conditions

Syndicate and underwrites the policies. For an in-depth discussion of this complicated insurance process, see *Allen v. Lloyds of London*, No.CIV.A.3:96CV522, 1996 WL 490177 (E.D.Va.Aug.23, 1996), *rev'd, Allen v. Lloyd's of London*, 94 F.3d 923 (4th Cir.1996). While Judge Payne's decision to grant injunctive relief was reversed, his informative review of

under which Plaintiff would be buying and the Names would be selling the reimbursement insurance, the parties entered into an insurance contract. The contract contained a service of suit clause which "was viewed by Lloyds as an important marketing tool for selling policies in the United States." Essentially, this clause served as a jurisdiction consent clause whereby the Names agreed to submit to the jurisdiction of any court in the United States if a dispute over a claim arose. As such, Plaintiff invoked the service of suit clause for jurisdiction in the United States and filed this action against the "Names" who sold the insurance policies seeking reimbursement of amounts it spent in defending previous company lawsuits.

In filing this action, Plaintiff also named Equitas as a defendant. Equitas was formed by Lloyds of London in 1996 to reinsure pre–1993 policies issued by the Names. This meant that Equitas would indemnify the Names/Syndicate for any amount they had to pay out on the policies they had issued before 1993. To be entitled to the indemnification, the Names had to enter a reinsurance contract with Equitas which provided that Equitas would have the exclusive authority to handle, litigate, defend and settle any claim arising against the Names. The contract also specifically provided that it did not have any "effect on the liability of any Name" and that it did not create any third-party beneficiary rights upon the policyholders.

### III. *Equitas' Motion To Dismiss*

#### A. Personal Jurisdiction Standard

Defendant Equitas argues that "this Court cannot constitutionally assert in personam jurisdiction over [it] because [it] lacks sufficient contacts with this forum." [See Dkt.# 4]. The Sixth Circuit has instructed that in order to determine whether personal jurisdiction exists, "federal courts apply the law of the forum state, subject to the limits of the Due Process Clause of the Fourteenth Amendment. 'The defendant must be amenable to suit

under the forum state's long-arm statute and the due process requirements of the Constitution must be met.'" *CompuServe Inc. v. Patterson,* 89 F.3d 1257, 1262 (6th Cir.1996) (citations omitted). "[P]ersonal jurisdiction may be either general or specific in nature, depending on the nature of the contacts in a given case." *Id.* at 1263. Here, Plaintiff seeks to establish specific jurisdiction over Defendant Equitas by demonstrating that Equitas is bound to a jurisdiction consent clause.

■■ To overcome Defendant Equitas' motion to dismiss for lack of jurisdiction, Plaintiff must make a prima facie showing of in personam jurisdiction. *See e.g., Dean v. Motel 6 Operating L.P.,* 134 F.3d 1269, 1272 (6th Cir.1998). As there has been no evidentiary hearing on this matter, the pleadings and affidavits will be considered in a light most favorable to Plaintiff and the court will not consider the controverting assertions of the moving party. *See id.* A plaintiff meets his burden of making a prima facie showing by simply demonstrating "facts which support a finding of jurisdiction." *Welsh v. Gibbs,* 631 F.2d 436, 438 (6th Cir.1980) (citations omitted). Therefore, given this lighter burden, " '[d]ismissal in this procedural posture is proper only if all the specific facts which the plaintiff ... alleges collectively fail to state a prima facie case for jurisdiction.' " *Kerry Steel, Inc. v. Paragon Industries, Inc.,* 106 F.3d 147, 149 (6th Cir.1997) (*quoting Theunissen v. Matthews,* 935 F.2d 1454, 1458 (6th Cir.1991)).

Plaintiff attempts to make a prima facie showing of jurisdiction by arguing that "[a]s the successor-in-interest to the Names who insured Millennium in 1984, Equitas is subject to the terms and conditions of the Policies, including the Service of Suit Clause under which the Names consented to the jurisdiction of this Court." [See dkt.# 14, p. 11]. To demonstrate its assertion that Equitas is a successor-in-interest to the Names and bound

the Lloyd's of London insurance/reinsurance process was left untouched.

by their jurisdiction consent clause, Plaintiff argues that:

> Under the Renewal & Reconstruction plan, Equitas was created for the express purpose of assuming the insurance contracts of the Names, which necessarily includes the Service of Suit Clause. The assumption of liabilities was both express and implied. Equitas expressly assumed the obligations of the Names in § 9.1 of the Run–Off Contract when it agreed to 'assume responsibility for ... and to perform the Run–Off' of the pre–1993 business. It also impliedly assumed the liabilities when it accepted the power in § 9.2(b) 'to adjust, handle, agree, settle, pay, compromise or repudiate any other liability.... of the [Names] of whatever nature....'

[See Response, dkt. # 14, at p. 12]. Accordingly, in order to determine whether Plaintiff has carried its burden of establishing a prima facie case of jurisdiction, the Court turns to Plaintiff's submitted materials. As Plaintiff argues that Equitas assumed the insurance contracts pursuant to the terms of the reinsurance contract, and thereby became a successor-in-interest who is bound by the jurisdiction consent clause, an examination of the reinsurance contract between the Names and Equitas becomes critical.

### 1. *The Reinsurance Contract*

■ To establish a centralized authority for litigating claims, Equitas contracted with the Names for the power to commence, conduct, and defend all legal proceedings on behalf of the Names. However, while the contract provided that Equitas would assume the authority to defend these claims, it did not provide that Equitas would assume liability for the claims. Plaintiff argues that paragraph 9.1 of the reinsurance contract expressly states that Equitas assumed such obligations.

However this paragraph specifically provides:

> In consideration of the Names and Closed Year Names, acting through the Substitute Agent, entering into the rein-

surance agreement contained in Part I of this Agreement, [Equitas] shall be entitled to assume, and undertakes and agrees to assume, responsibility for, and the Names and Closed year Names irrevocably appoint [Equitas] to perform, the Run-off in accordance with the provisions of this Part II of this Agreement and subject to and in accordance with the provisions of the EATD, the ECTD and any Overseas Trust Deeds.

[See Reinsurance Contract at p. 21]. As per the express terms of the reinsurance contract, Equitas assumed responsibility for the Run-off. According to Plaintiff, "Run-off" is a term of art in the reinsurance business which means "to pay or discharge a liability or obligation." [See dkt. # 14, p. 12 fn. 12]. Even considered in a light most favorable to Plaintiff, this provision means that Equitas merely assumed responsibility for "pay[ing] or discharg[ing] a liability." This provision does not expressly provide that Equitas assumed the Names' liabilities as Plaintiff contends, rather it evidences Equitas' responsibilities to indemnify the Names.

Moreover, the reinsurance contract between Equitas and the Names specifically provides that, "[t]his Agreement is to take effect as a contract of reinsurance and shall have no effect on the liability of any Name or Closed Year Name under any original contract of insurance entered into by such Name...." [See Reinsurance Contract at p. 3]. Even though the pleadings are to be construed in a light most favorable to Plaintiff, this Court must nevertheless also follow the cardinal rule of contract interpretation, i.e. "[i]n the absence of ambiguity a written instrument will be enforced strictly according to its terms." *O'Bryan v. Massey–Ferguson, Inc.*, 413 S.W.2d 891, 893 (Ky.1966). Therefore, where "[t]he words are plain, [they] will be given their usual meaning." *Id.* (citing *Bays v. Mahan*, 362 S.W.2d 732 (Ky.1962)). A court "cannot disregard the plain, unambiguous language of the contract." *United Ins. Co. of America v.*

*Gerstle,* 339 S.W.2d 945, 946 (Ky.1960) (*citing United States Fidelity & Guaranty Co. v. Lairson,* 271 S.W.2d 897 (Ky.1954)). Here, given their plain meaning, the terms of the reinsurance contract cannot be construed to bind Equitas to the Names' jurisdiction consent clause. Equitas did not assume the insurance contracts, rather, it assumed the responsibility for paying the liabilities arising under the insurance contracts. As such, Equitas cannot be deemed a successor-in-interest to the jurisdiction consent clause. Accordingly, Plaintiff has failed to meet its prima facie burden of demonstrating facts which would establish jurisdiction.

### 2. Closely Related Status

Alternatively, Plaintiff asserts that "... as the party responsible for paying the claims of the Names, Equitas is so closely related to the dispute that it is bound by the Policies." [See dkt. # 14, p. 11]. Plaintiff cites *Employers Ins. of Wassau v. Certain London Mkt. Cos., et.al.,* No. 97–C–0409, 1997 U.S.Dist. Lexis 22027 (W.D.Wis. Oct. 27, 1997), and *Employers Ins. of Wassau v. Certain London Mkt. Cos., et.al.,* No. 97 Civ. 0409C (W.D.Wis. Feb. 10, 1998) as support for this proposition. In *Wassau,* the district court held that it had personal jurisdiction over Equitas not because Equitas is a successor-in-interest who should be bound by the forum selection clause, but because Equitas is so closely related to this dispute it should have foreseen that policyholders would try to bind it to an American jurisdiction. *See* 1997 U.S.Dist. Lexis 22027. Judge Crabb reasoned that "[d]etermining whether jurisdiction exists over Equitas involves the law concerning forum selection clauses, not the law of reinsurance." *Id.* at *14. Thus, to make the jurisdiction determination, Judge Crabb applied a Seventh Circuit decision holding that "a 'non-party to a forum selection clause' may be bound to the clause when the non-party is 'closely related to the dispute such that it becomes foreseeable that it will be bound.'" *Id.* at *16 (*quoting Hugel v. Corp. of Lloyd's,* 999 F.2d 206, 209 (7th Cir.1993)). Using the *Hugel* approach, Judge Crabb found that since "... Equitas has assumed control over all litigation relating to disputes over defendant Names' pre–1993 policies[,][s]uch a broad grant of authority makes Equitas closely related to the dispute here." *Id.* at *22. And, in regard to the foreseeability factor, Judge Crabb found that "... when Equitas took control of the Names' pre–1993 obligations and assumed the power to litigate disputes arising out of those obligations, it should have realized it would be bound to these forum selection clauses." *Id.* at *22–23.

However, this Court finds such analysis inapposite. In *Hugel,* the plaintiff was an underwriting member of the Lloyd's of London society (a Name) and was also President and Chairman of two companies: Gulf Coast Marine, Incorporated (GCM) and Ocean Marine Indemnity Company (OMI). *See Hugel,* 999 F.2d at 207. Managers at Lloyd's suspected that Hugel and his company, GCM were involved in criminal misconduct, so they launched an investigation and internal disciplinary proceeding against Hugel. *See id.* Hugel cooperated and provided necessary documents, including documents relating to both his companies, GCM and OMI (Hugel owned 99% of the stock in GCM and 100% of the stock in OMI). *See id.* Following the investigation, Hugel filed suit against Lloyd's in both his personal capacity and his official capacity as President and Chairman of both GCM and OMI alleging that Lloyd's inappropriately made various confidential disclosures causing Hugel, GCM and OMI to lose business. *See id.* The district court refused to exercise jurisdiction over Hugel's suit because a forum selection clause found in Hugel's contract with Lloyd's required the suit to be filed in England. *See id.* And, since Hugel involved his two corporations in the investigation, the district court also found that GCM and OMI were so closely related to the dispute that they too were bound by the forum selection clause. *See Hugel,* 999 F.2d at 210. On appeal, GCM and OMI argued that the forum selection

clause only bound Hugel to file suit in England, not them. *See id.* at 209. The Seventh Circuit rejected this argument and held that the district court was not clearly erroneous in holding the companies closely-related and bound by the forum selection clause since Hugel owned between 99 and 100% of the stock in both corporations, was both President and Chairman of each corporation and directly involved them in the Lloyd's investigation. *See id.*

Judge Crabb applied the *Hugel* "closely-related" analysis and found that Equitas should be bound to the forum selection clause because it was foreseeable that "in disposing of pre–1993 matters *for the Names,* it would be drawn into litigation in distant forums." *Wassau,* No. 97 Civ. 0409C at 7 (slip op.) (W.D.Wis. Feb. 10, 1998) (emphasis added). In arriving at this conclusion though, Judge Crabb did not focus on the relationship between the Names and Equitas. Instead, Judge Crabb focused on the forum selection clause found in the plaintiff's contract with the Names. Here, Plaintiff has even acknowledged that "[t]he present motion turns on the relationship between Equitas and the Names at Lloyds who issued the policies to Millennium." [See Dkt. # 14, p. 3]. Accordingly, this Court will focus on the reinsurance relationship and reinsurance contract to which Equitas was a party, instead of focusing on the forum selection clause and insurance contract to which Equitas was not a party.

■ A review of the express language in the reinsurance contract between Equitas and the Names reveals that the parties did not intend to create any third-party beneficiary rights on behalf of the policyholders. Equitas was created solely for the purpose of indemnifying the Names, not "for the express purpose of assuming the insurance contracts of the Names ..." as Plaintiff contends. [See Dkt. # 14, p. 12]. To hold that Equitas is so closely related it should be bound to this forum would require this Court to ignore the express language of the contract and find that even though the

contract specifically stated that it did not create any third party beneficiary rights upon policyholders, Plaintiff is entitled to bind Equitas to this forum because Equitas agreed to defend and indemnify the Names. Such an interpretation would be contrary to general principles of contract law and interpretation. And, while this Court agrees with Judge Crabb that "Equitas should have anticipated that the clauses might affect their efforts *to settle matters for the Names,*" *Wassau,* 1997 U.S.Dist. Lexis 22027 at *23 (emphasis added), this Court does not agree that Equitas should have foreseen that the policyholders would try to *bind it directly* because it contracted to defend the Names. This Court will not ignore the terms of the contract and set such a dangerous precedent.

Seemingly, as this Court has already determined that Defendant Equitas should be dismissed from this action pursuant to Rule 12(b)(2), there is no need to proceed further and address Defendant Equitas' Rule 12(b)(6) failure to state a claim argument. However, even if Plaintiff had carried its burden of demonstrating a prima facie case of jurisdiction to defeat the 12(b)(2) motion to dismiss, it would have still faced Defendant's 12(b)(6) motion to dismiss. Since this Court has gone to great lengths to thoroughly study the contracts and submitted materials, and finds the analysis under both motions to be intertwined, the Court will take this opportunity to make an alternative finding in regards to Defendant Equitas' Rule 12(b)(6) motion to dismiss.

### B. *Failure to State A Claim*

■ Equitas argues that Plaintiff "can state no viable legal claim against Equitas [because] [i]t is a well-established principle of insurance law that a policyholder has no right of action against its insurer's reinsurer." [See dkt. # 4]. In response, Plaintiff argues that Equitas "is a successor-in-interest to the Names who assumed a direct relationship with policyholders when it

agreed to pay all the insurance liabilities of the Names in exchange for all their assets." [See dkt. # 14, p. 15]. Essentially, Plaintiff argues that "Equitas is not a reinsurer who is immune from suit because it deals directly with policyholders by collecting premiums, negotiating settlements, and paying claims," [See id., p. 18] and that Equitas described the transfer of liabilities as reinsurance "[i]n an attempt to preclude policyholders from suing Equitas directly." [See Complaint, p. 8].

A very similar argument was previously addressed by the district court in *USX Corp. & Bessemer & Lake Erie R.R. Co. v. Adriatic Ins. Co., et. al.,* No. 95–866 (W.D.Pa. Sept. 30, 1998). In *USX,* the plaintiff argued that the reinsurance contract was an assignment and delegation agreement whereby Equitas assumed a direct duty to the policyholders. Such an "assumption agreement" would have " 'shift[ed] the risks from the original insurer to a second insurer and the second insurer [would have] assume[d] direct liability to the insured.' " *Id.* at 16. In rejecting the argument, Judge Diamond stated, "Plaintiffs make much of the fact that Equitas is involved in handling plaintiffs' claims and may ultimately pay any judgment which plaintiffs obtain against the London Defendants. It was long ago recognized, however, that the mere fact that a reinsurer has the authority to adjust losses or to pay a policyholder directly does not provide an underlying policyholder with a direct cause of action against a reinsurer." *Id.* at 17. In addition, Judge Diamond stated:

The contract upon which the plaintiffs seek to join Equitas is one which is distinct from the insurance policies at issue. The reinsurance contract is a separate transaction and occurrence upon which plaintiffs seek to create independent rights against an entity created in 1996. The reinsurance contract expressly provides that Equitas has not assumed the liabilities of the Names in the underlying policies of insurance and that the names through the Syndicates remain severally liable on the insured

policies. The reinsurance contract further provides that it was not the intent of the parties to create an intended benefit to the policyholders in contractual privity with the Names and Syndicates. Instead, it is readily apparent that the contracting parties intended to stabilize the London insurance market and permit the Names to close various policy years. *Under the circumstances, the contracting parties agreed to transfer assets and reinsurance to a central administrator in exchange for that administrator's managements of and indemnification for contingent liability. In the end analysis the agreement is one of reinsurance and plaintiffs have no contractual right to sue Equitas directly.* USX, No. 95–866 at 22 (emphasis added).

After thoroughly reviewing the pleadings, contracts, and applicable case law, this Court finds itself in complete agreement with Judge Diamond's analysis and conclusions. As a matter of law, Equitas did not assume the Names' liabilities. As per the express provisions of the contract, Equitas would litigate and defend the Names in actions arising over claims and would provide indemnification, but such an arrangement would not have any "effect on the liability of any Name." As Judge Diamond stated, "[i]n the end analysis[,] the agreement is one of reinsurance and plaintiffs have no contractual right to sue Equitas directly."

## 1. *Reinsurance To Close*

In addition, Plaintiff argues that although the contract refers to the relationship as one of reinsurance, it is really reinsurance-to-close. According to Plaintiff, " [r]einsurance-to-close allows a syndicate that has ceased trading to close its books and transfer its obligations to an active syndicate.... [where] the new Names assume direct responsibility for dealing with policyholders, ... [and] the original Syndicate assigns all its assets, including reserves, future premiums, and reinsurance recoverables to the new

Names." [See dkt. # 14, p. 19]. Basically, what this means is that one group of Names, a Syndicate reinsures another Syndicate's liabilities in exchange for its premiums. The Fourth Circuit explained this process as follows:

> The Lloyd's market operates under a three year accounting cycle. At the end of the third year after a syndicate is formed, underwriting profits and losses for each syndicate year are calculated, and the estimated liabilities are routinely reinsured by another syndicate. Through this process, Lloyd's reinsures undischarged risks to close the account. When the magnitude of potential liabilities for a syndicate cannot reasonably be estimated at the end of three years, the syndicate cannot reinsure them, and the participating Names remain liable on their undertaking.

*Allen v. Lloyd's of London,* 94 F.3d 923, 927 (4th Cir.1996).

Due to catastrophes such as Hurricane Hugo and unanticipated losses from pollution and asbestosis suits in the late 1980s and early 1990s, losses began to exceed the premiums. This meant that the Names that issued these pre–1993 policies could not find other groups of Names/Syndicates to reinsure-to-close their liabilities. For those that could not obtain reinsurance-to-close from other Syndicates, they went into "Run-off" subjecting them to further losses and preventing them from closing their books for that year of account. To solve this problem, and to provide some stability in the insurance market, Lloyd's of London created Equitas in 1996 to reinsure the Names' pre–1993 underwriting obligations.

■ Plaintiff argues that in this manner, reinsurance-to-close creates a direct relationship with policyholders and that since Equitas is conducting the Names' "Run-off," it has a direct relationship with policyholders such as Plaintiff. Such an assertion was previously addressed by the district court in *Long Island Lighting Co. v. Aetna Cas. & Sur. Co.,* No. 96–9664(MBM), 1997 WL 567342 (S.D.N.Y. Sept.11, 1997). There, the plaintiff argued that "... Equitas, by virtue of having 'reinsured to close' several pre–1993 liability insurance policies, now qualifies as the 'real party in controversy' .... [and] that as a result of this reinsurance, Equitas— not the Names—bears the burden of making payment on these policies." *Id.* at *3. In rejecting this argument, Judge Mukasey stated, "... despite the reinsurance, the Names remain the 'real parties to the controversy' .... It is the Names—and not Equitas—who are severally liable to the insured on the insurance policies at issue here even if Equitas 'reinsured' these policies 'to close.' ... The alleged relationship between Equitas and the Names is one of reinsurance and indemnity, which does not change the Names' liability on the policies at issue." *Id.* A review of the contract at issue reveals that as a matter of law, Judge Mukasey's conclusion is correct because even if the Names participated in reinsurance-to-close, they would still be liable to policyholders if Equitas could not cover all claims.

### 2. The Reorganization of a Business

■ Plaintiff also asserts that "[t]he transfer of assets and liabilities from the Names to Equitas was not reinsurance, it was the sale of a business. Equitas acquired all the assets of the Names ... and assumed all liabilities to policyholders, without limits [which] permitted Names to resign from the insurance business, effectively ending their liabilities to policyholders." [See dkt. # 14, p. 21]. And, in order to understand this transaction, Plaintiff contends the Court has to also consider the settlement offer. Surprisingly though, the express language found in the settlement offer contradicts Plaintiff's assertion that the transaction ended the Names' liability to policyholders. For example, pursuant to the terms of the settlement offer, "[i]t is not within the power of Lloyd's to grant Names an absolute release from their liabilities to policyholders. Despite the reserve strengthening agreed with the DTI and the board of Equitas, there will

still be a residual risk for Names of failure by Equitas to pay in full liabilities in respect of 1992 and prior business." [See dkt. # 14, exh. E, p. 112]. In addition, the settlement offer also provides:

> ... the 'finality' offered by the Reconstruction and Renewal plan is not absolute. In particular, Names should note that the 'finality' offered will only be absolute if Equitas meets the 1992 and prior liabilities in full as they fall due.... If Equitas determines that it has insufficient assets and becomes unable to meet the 1992 and prior liabilities in full as they fall due, it may decide to implement a proportionate cover plan under the provisions set out in the Reinsurance Contract. In this regard, the following points should be noted ... as Names retain the ultimate liability to policyholders, they would therefore remain liable for the proportion of a claim not met by Equitas, if Equitas were to invoke proportionate cover.

[See id. at p. 142–144].

Pursuant to this background and the express language in the reinsurance contract, the parties entered into an indemnification agreement which did not end the Names' liabilities to policyholders. In reviewing the arrangement, the Fourth Circuit noted, "Equitas' capital is to be funded by loans, a cash call on Names, and the $4.8 billion in credits assembled by Lloyd's for the settlement of the Names' claims.... Under the Plan, any capital that remains after Equitas has satisfied all outstanding pre–1993 obligations will be returned to the Names.... Indeed, the Plan creates Equitas solely to reinsure and discharge Names' preexisting obligations, not to underwrite new risks for profit." *Allen v. Lloyd's of London,* 94 F.3d 923, 927–31 (4th Cir.1996). Thus, although the Names transferred assets to Equitas in exchange for indemnification, the transaction was not the sale of a business. Therefore, as the agreement was one of reinsurance and indemnification, and not one of a successor-in-interest or sale of a business, policyholders do not have contractual privity to sue Equitas directly. As such, De-

fendant Equitas' Motion to Dismiss is granted, in the alternative, for failure to state a claim pursuant to Rule 12(b)(6).

An appropriate order accompanies this memorandum opinion.

## *ORDER*

For the reasons stated in the memorandum opinion, and the Court being otherwise sufficiently advised,

**IT IS ORDERED:**

Defendant Equitas' Motion to Dismiss [dkt. # 4] is granted. Defendant Equitas Limited and Defendant Equitas Reinsurance Limited, collectively "Equitas," are dismissed as parties in this matter.